| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>DANIEL GRILLO | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>M 14 01126 |

Complaint for violation of Title 18, United States Code, Section 473

| NAME OF MAGISTRATE JUDGE<br>HONORABLE VICTOR B. KENTON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|
| June 5, 2014 | Los Angeles County | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 473]

On or about June 5, 2014, in Los Angeles County, within the Central District of California, defendant DANIEL GRILLO, acting with intent to defraud, sold, exchanged, transferred, and delivered, counterfeited obligations and securities of the United States, namely, approximately $100,000 counterfeit Federal Reserve Notes, knowing that the notes were falsely made, forged, and counterfeited.

FILED
CLERK, U.S. DISTRICT COURT
JUN - 6 2014
CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>John Oliver |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – United States Secret Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]<br>RALPH ZAREFSKY | DATE<br>June 6, 2014 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Yasin Mohammad x0649    REC: Detention
    ym

## AFFIDAVIT

I, John E. Oliver II, being duly sworn, hereby depose and state as follows:

### I. INTRODUCTION

1. I am a Special Agent of the United States Secret Service (USSS) and have been so employed since March 11, 2002. I am currently assigned to the USSS Los Angeles Field Office (LAFO) Counterfeit Squad, where I investigate violations of federal law relating to the manufacturing, distribution, and passing of counterfeit United States currency. In 1996, I graduated from the University of Tennessee with a Bachelors of Science in Criminal Justice. In 2002, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia, and the USSS Special Agent Training Course in Beltsville, Maryland. I have specialized training in the detection, identification, and investigation of counterfeit United States currency. Prior to my employment with the USSS, I was a Kentucky State Police Trooper, for approximately 3 years. As a Police Officer, I investigated crimes which included burglaries, assaults, and narcotics (manufacturing, transportation, distribution, and possession).

2. I make this affidavit in support of an application for a criminal complaint against Daniel Grillo ("Grillo"), for violating Title 18, United States Code, Section 473 (Dealing in counterfeit obligations or securities).

3.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. OVERVIEW OF INVESTIGATION

4.  This investigation involves the distribution, and passing of a sophisticated, high occurrence, Counterfeit ("CFT") $100 Federal Reserve Note ("FRN") and $50 FRN by Grillo.

5.  Genuine U.S. currency, and, more specifically, 1996 style $100 FRNs, as they relate to this investigation, are produced by the United States Bureau of Engraving and Printing. This style of $100 FRNs incorporates two specific printing processes, exhibits numerous security features, and is printed on specialized paper. As a Special Agent of the USSS, I am trained in the printing processes, security features, and paper characteristics of genuine FRNs and am able to recognize counterfeiting methods that attempt to simulate the features present on genuine currency.

6.  There are two main methods of producing CFT FRNs: (1) the ink-jet method and (2) the off-set/printing-press method. Ink-jet-produced CFT notes are the most common type of CFT made in the United States. Off-set/printing-press style CFT

notes, on the other hand, are unique, rare, and require a certain level of sophistication to produce. The more measures the counterfeiter takes to simulate the characteristics of genuine FRNs, the higher the level of sophistication of the CFT.

7. Given, as outlined below, the numerous measures taken by the counterfeiter during the manufacturing process in an attempt to simulate features of genuine U.S. currency, this investigation involves off-set produced CFT FRNs that fall within the higher end of the spectrum of sophistication in their production:

a. Security fibers: The subject CFT in this case display red and blue security fibers found on genuine FRNs. The presence of security fibers are the result of off-set printing. This enhances the appearance of authenticity on the subject CFT notes;

b. Security thread: In many instances, the subject CFT notes display the security thread of a genuine $100 or $50 FRN within the paper. At a glance, a cash handler may visually detect the presence of a security thread for a $100 or $50 FRN within the subject CFT notes. This enhances the appearance of authenticity on the subject CFT notes;

c. Watermark: In many instances, the subject CFT notes display the watermark of a genuine $100 or $50 within the paper of the subject CFT;

d. Color-shifting ink: The subject CFT FRNs in this case display automotive style metallic paint, usually of a greenish color, in the lower right-hand corner of the bill where

the denomination of the bill such as "100" or "50" appears. Genuine 1996 and post-1996 $100 and $50 FRNs have optically variable ink (OVI), also known as color-shifting ink, in the lower right-hand corner that shifts from green to copper as the note is tilted 45 degrees. This enhances the appearance of authenticity on the subject CFT notes.

      e.   Serial number:  The subject CFT in this case has multiple serial number variations to avoid detection by cash handlers and/or law enforcement personnel. This also enhances the appearance of authenticity on the subject CFT notes, because genuine FRNs are printed with individualized serial numbers located in the upper left-hand corner and lower right-hand corner of the note. The serial number of a genuine note, printed with a typographic printing process, is unique to that note and will not be found on any other note. By avoiding having to pass CFT notes with the same serial number in a single transaction, the counterfeiter is more likely to avoid detection.

      f.   The reasons above show that Grillo deals in sophisticatedly produced CFT FRNs for which extensive measures have been taken to resemble genuine FRNs. This has enabled Grillo to distribute the subject CFT notes in high volume causing a significant community impact.

### III. CLASSIFICATION OF COUNTERFEIT

8.  The USSS receives CFT FRNs from a variety of sources, including merchants, law enforcement, financial institutions, and the United States Federal Reserve. These CFT FRNs are

collected, sorted, analyzed, categorized, and entered into a USSS database called the Counterfeit Tracking Application (CTA). When a particular CFT FRN with multiple occurrences reaches a loss amount of $10,000 (a "high occurrence note"), a New Counterfeit (NC) number is generated. After the NC number is generated, additional specimen notes are forwarded to Secret Service Headquarters for further analysis. At the conclusion of this analysis, and after it is determined that the CFT FRNs are forensically linked, a numerical identifier is assigned, which USSS refers to as a "circular" (CIRC). The CTA database allows agents to search and track the passing history of any CIRC note. The CFT FRNs associated with this investigation have been designated the CIRC numbers of C25198, C25139, C23985, and C24804 with documented passing histories in excess of $20,000,000.

### IV. STATEMENT OF PROBABLE CAUSE

9. On 6/13/13, a Confidential Informant ("CI") provided information to the LAFO Counterfeit Squad that a subject by the name of "Daniel Grillo" was trafficking and selling Peruvian made CFT Federal Reserve Notes (FRNs). The CI also provided a sample CFT FRN Grillo was trafficking. A USSS database query done by Debbie Winfrey, Counterfeit Management Specialist with the USSS, of that sample CFT FRN showed that the note was extensively passed in the greater Los Angeles, CA area.

10. On 6/13/14, I conducted NCIC/NLETS inquiries on the name and identifiers of "Daniel Grillo." The query indicated that Daniel Grillo had a criminal history including a conviction

5

for possession of CFT U.S. currency in 1994. On the same date, I conducted an MCI inquiry on the name and identifiers of "Daniel Grillo," which revealed that Daniel Grillo had been convicted of Possession of CFT U.S. currency by the LAFO in 1994.

11. On 6/13/13, the CI contacted Grillo at telephone number (818) 212-3960. According to the CI, Grillo agreed to sell to the CI the following day ten thousand dollars ($10,000) in CFT FRNs for a price of $2,700 in genuine currency.

12. On 06/14/13, the LAFO conducted an operation utilizing the CI to purchase $10,000 in CFT FRNs from Grillo for $2,700 in genuine U.S. currency (transaction 1). The operation is detailed below:

    a. At approximately 1000 hours, the CI met the LAFO team at a prearranged location ("the staging location") where I briefed the CI on the details of the operation.

    b. I then searched the CI and his vehicle and found no contraband.

    c. I provided the CI $2,700 in genuine U.S. currency for the anticipated transaction.

    d. The CI then left the staging location en route to a predetermined meet location ("the meet location") — a Ralph's grocery parking lot located at 12921 Magnolia Boulevard, Van Nuys, CA. The CI and Grillo had previously agreed to conduct the transaction at the meet location.

    e. At approximately 1050 hours, I observed the CI arrive at the meet location.

f.   At approximately 1215 hours, I observed Grillo – whom I recognized from his California DMV photograph – exit a black Mercedes Benz (CA License No. 3VCA105), and enter the CI's vehicle carrying what appeared to be a grocery bag. I observed Grillo remain inside the CI's vehicle for approximately twenty (20) minutes. Grillo then left the meet location in his vehicle.

g.   The LAFO team kept uninterrupted visual surveillance on the CI from the time I initially searched him until the time the CI met me after concluding transaction 1, and gave me the CFT FRNs he had just purchased from Grillo.

h.   Immediately thereafter, Special Agent Mithin Neth searched the CI and his vehicle, and found no contraband.

13.  On 8/29/13, the CI contacted Grillo at telephone number (818) 212-3960. According to the CI, Grillo agreed to sell to the CI on the following day ten thousand dollars ($10,000) in CFT FRNs for a price of $2,700 in genuine currency.

14.  On 8/30/13, the LAFO conducted an operation utilizing the CI to purchase $10,000 in CFT FRNs from Grillo for $2,700 in genuine U.S. currency (transaction 2). The operation is detailed below:

a.   At approximately 1015 hours, the CI met the LAFO team at a prearranged location ("the staging location") where I briefed the CI on the details of the operation.

b.   Special Agent Craig Kimbrough then searched the CI and his vehicle, and found no contraband.

c. I provided the CI $2,700 in genuine U.S. currency for the anticipated transaction and placed a digital audio/video recording device in the CI's vehicle.

d. The CI then left the staging location en route to a predetermined meet location ("the meet location") — a Ralph's grocery parking lot located at 12921 Magnolia Boulevard, Van Nuys, CA. The CI and Grillo had previously agreed to conduct the transaction at the meet location.

e. At approximately 1040 hours, I observed the CI arrive at the meet location.

f. At approximately 1205 hours, I observed Grillo – whom I recognized from his California DMV photograph and transaction 1 – exit a black Mercedes Benz (CA License No. 3VCA105), and enter the CI's vehicle. I observed Grillo remain inside the CI's vehicle for approximately fifteen (15) minutes. Grillo then left the meet location in his vehicle.

g. The LAFO team kept uninterrupted visual surveillance on the CI from the time Special Agent Kimbrough initially searched him until the time the CI met me after concluding transaction 2, and gave me the CFT FRNs he had just purchased from Grillo. Immediately thereafter, Special Agent Kimbrough searched the CI and his vehicle, and found no contraband. I removed the audio/video recording device from the CI's vehicle and later preserved the recording.

15. On 9/20/13, the CI contacted Grillo by telephone. According to the CI, Grillo agreed to sell to the CI on the

8

following day ten thousand dollars ($10,000) in CFT FRNs for a price of $2,700 in genuine currency.

16. On 9/21/13, the LAFO conducted an operation utilizing the CI to purchase $10,000 in CFT FRNs from Grillo for $2,700 in genuine U.S. currency (transaction 3). The operation is detailed below:

    a. At approximately 1150 hours, the CI met with Special Agent Donald Burke and me at a prearranged location ("the staging location") where I briefed the CI on the details of the operation.

    b. I then searched the CI and Special Agent Burke searched his vehicle, and found no contraband.

    c. I provided the CI $2,700 in genuine U.S. currency for the anticipated transaction and placed a digital audio/video recording device in the CI's vehicle.

    d. The CI then left the staging location en route to a predetermined meet location ("the meet location") — a Ralph's grocery parking lot located at 12921 Magnolia Boulevard, Van Nuys, CA. The CI and Grillo had previously agreed to conduct the transaction at the meet location.

    e. At approximately 1210 hours, I observed the CI arrive at the meet location.

    f. At approximately 1230 hours, I observed Grillo – whom I recognized from his California DMV photograph and transactions 1 and 2 – exit a black Nissan Sentra (CA License No. 6VXA869, registered to Grillo), and enter the CI's vehicle. I observed Grillo remain inside the CI's vehicle for

approximately twenty-five (25) minutes. Grillo then left the meet location in his vehicle.

      g.    The LAFO team kept uninterrupted visual surveillance on the CI from the time I initially searched him until the time the CI met me after concluding transaction 3, and gave me the CFT FRNs he had just purchased from Grillo. Immediately thereafter, Special Agent Burke searched the CI and his vehicle, and found no contraband. I removed the audio/video recording device from the CI's vehicle and later preserved the recording.

    17.    On 2/20/14, the CI contacted Grillo by telephone. According to the CI, Grillo agreed to sell to the CI on the following day ten thousand dollars ($2,000) in CFT FRNs for a price of $548 in genuine currency.

    18.    On 2/21/14, the LAFO conducted an operation utilizing the CI to purchase $2,000 in CFT FRNs from Grillo for $548 in genuine U.S. currency (transaction 4). The operation is detailed below:

      a.    At approximately 1200 hours, the CI met with Special Agent Rodney Wellman and me at a prearranged location ("the staging location") where I briefed the CI on the details of the operation.

      b.    I then searched the CI and Special Agent Welman searched his vehicle, and found no contraband.

      c.    I provided the CI $548 in genuine U.S. currency for the anticipated transaction and placed a digital audio/video recording device in the CI's vehicle.

       d.    The CI then left the staging location en route to a predetermined meet location ("the meet location") — Las Quenas Restaurant located at 12708 Sherman Way, North Hollywood, CA. The CI and Grillo had previously agreed to conduct the transaction at this meet location.

       e.    At approximately 1337 hours, I observed the CI arrive at the meet location.

       f.    At approximately 1415 hours, I observed Grillo - whom I recognized from his California DMV photograph and transactions 1, 2, and 3 - exit the Las Quenas Restaurant with a female the CI later identified as Grillo's girlfriend. I then observed Grillo enter the CI's vehicle, but Grillo's girlfriend did not. I observed Grillo remain inside the CI's vehicle for approximately five (5) minutes. Grillo then left the meet location in a gold Honda minivan (CA License No. 4HYD888, registered to Grillo) with his girlfriend.

       g.    The LAFO team kept uninterrupted visual surveillance on the CI from the time I initially searched him until the time the CI met me after concluding transaction 4, and gave me the CFT FRNs he had just purchased from Grillo. Immediately thereafter, I searched the CI and his vehicle, and found no contraband. I removed the audio/video recording device from the CI's vehicle and later preserved the recording.

19. On 5/30/14, I observed and recorded a telephone conversation between the CI and Grillo during which Grillo agreed to sell the CI $100,000 CFT FRNs for $24,000 in genuine

11

currency. The deal was initially set to occur on 6/4/14; the date was later changed to 6/5/14 and the price to $25,000.

20. On 6/5/14, the LAFO conducted an operation utilizing the CI to purchase $100,000 in CFT FRNs from Grillo for $25,000, split into two payments of $16,000 and $9,000, in genuine U.S. currency (transaction 5). The operation is detailed below:

    a. At approximately 1000 hours, the CI met the LAFO team at a prearranged location where I briefed the CI on the details of the operation.

    b. I then searched the CI and Special Agent Kimbrough searched the CI's vehicle and found no contraband.

    c. I placed a digital audio/video recording device in the CI's vehicle.

    d. The LAFO team then went with the CI to another pre-determined location near the location where the transaction was to occur. The CI was driving alone in his own vehicle. The LAFO team kept constant, uninterrupted visual surveillance on the CI from the first location to the second. The CI made contact with no other individual during this trip.

    e. I provided the CI $16,000 in genuine U.S. currency in an envelope for the anticipated transaction.

    f. The CI then left the second location en route to a predetermined meet location ("the meet location") — a Ralph's grocery parking lot located at 12921 Magnolia Boulevard, Van Nuys, CA. The CI and Grillo had previously agreed to conduct the transaction at the meet location.

   g. At approximately 1240 hours, I observed the CI arrive at the meet location.

   h. At approximately 1325 hours, I observed Grillo – whom I recognized from his California DMV photograph and transaction 1, 2, 3, and 4 – arrive in a black Mercedes Benz S550 (CA License No. 6KWM256) and remain in the vehicle. Shortly thereafter, I observed the CI exit his vehicle and enter Grillo's vehicle on the front passenger side, while Grillo remained in the driver's seat.

   i. At approximately 1335, I observed the CI pour a bottle of water out of Grillo's front passenger window, which was our signal that transaction 5 had been completed.

   j. The LAFO team, including me, immediately went to Grillo's vehicle and had Grillo and the CI exit the vehicle. We then searched the vehicle. Inside Grillo's vehicle, I observed that CFT FRNs were located on the front passenger's side floorboard in of a brown leather satchel. Front my training and experience, I determined that there was approximately $100,000 in CFT FRNs in the brown leather satchel. I located the envelope containing the $16,000 genuine currency inside the front center console of the vehicle. Grillo was arrested.

//
//

## V. CONCLUSION

21. For all the reasons described above, there is probable cause to believe that Grillo has violated Title 18, United States Code, Section 473 (dealing in counterfeit obligations or securities), as described above.

John Oliver, Special Agent
United States Secret Service

Subscribed to and sworn before me this 6th day of June, 2014.

RALPH ZAREFSKY

HONORABLE V~~ICTOR B. KENT~~ON
UNITED STATES MAGISTRATE JUDGE